## BUTTE, ANACONDA & PACIFIC RAILWAY COMPANY, Respondent, *v.* THE MONTANA UNION RAILWAY COMPANY et al., Appellants.

[Submitted June 19, 1895. Decided July 29, 1895.]

Eminent Domain—*Public use.*—The character of a way, whether it is public or private, is determined by the extent of the right to use it and not by the extent to which that right is exercised.

Same—*Same—Railroads.*—Under sections 5 and 7 of Article XV of the constitution declaring that all railroads shall be public highways, and common carriers, and prohibiting discrimination in charges or facilities for transportation of freight or passengers, a railroad, though built by a private corporation and with its main line and spurs running convenient to private mines and ore houses, is none the less a public use and may exercise the right of eminent domain.

Same—*Same—Mining.*—In this state, where mining is the dominant industry, the magnitude of the interests involved may properly become a determining factor in sustaining the right of a railroad to construct lateral branches, tracks and spurs to mines and mining works, as public uses, by virtue of the law of eminent domain.

Same—*Same—Public use—Necessity of use.*—The right of eminent domain may be exercised by one railroad as to the right of way of another road when the latter's right of way is twenty-five feet on each side of the center of its track which runs along the side of a mountain, but which was only graded a little more than necessary for the actual space occupied by its road bed, and the adjacent portion of the right of way on

the upper hill side which was sought to be condemned, was not used, nor could be used without heavy excavation work, it being necessary by reason of the character of the mountain side and the necessity of crossing several spurs of the defendant road, that the plaintiff road be laid down to the same level as the other, it being wholly impracticable and unreasonable to go low enough to pass beneath the spurs, and to build overhead would require the plaintiff road to run into the mountain at enormous expense and switch back in order to reach the objective points of the two roads, besides materially interfering with the quartz mining operations in the vicinity, while in going upon defendant's right of way the plaintiff road would merely widen the cuts already made by the defendant road, causing no material damage, the distance between the centers of the tracks being from seventeen to twenty-two feet, and the principal object of both roads in their branches about the mountain being to haul ores from the mines. Nor would it be any objection to the condemnation of such portion of defendant's right of way, that such occupancy by the plaintiff road would render it difficult for the defendant road to construct switches or side tracks and to handle ties, it appearing that a distance of twenty-two feet between the centers of the tracks would leave room for another track, and where the elevation of the plaintiff road was so high as to prevent the defendant road from crossing at right angles a spur could be run to attain the proper elevation. Nor would the fact that the defendant road might require the condemned portion of its right of way in the future for a double track be sufficient to prevent such occupancy by the plaintiff road where the necessity was a mere future possibility and not based upon reasonably apparent traffic needs.

SAME—*Same—Crossings.*—The mere fact that the defendant road might be inconvenienced in the operation of their trains at the various crossings of the plaintiff road would constitute no objection to plaintiff's occupancy, since the right of one railroad to cross another is expressly given by section 5, Article XV of the constitution.

SAME—*Same—"More necessary public use".*—Where a railroad, which traverses the side of a mountain in a mining section has within its right of way tracts of ground not necessary to the proper, successful and safe operation of its system of tracks and spurs, and which have not been used by it during the several years of its construction in connection with any such operations, and in all reasonable probability not necessary for any such future use, and another road in seeking the same objective points is obliged to take parts of such unused right of way to avoid a considerably more circuitous route at a different grade, of very much greater cost and of serious damage to many mining properties, and would, in any event, be obliged to parallel the adversary road a part of the way, under such conditions the taking of the unused parts of the right of way of the one railroad by the other is a more necessary public use, within the meaning of section 601, First Division of the Compiled Statutes, providing that before property already appropriated to some public use may be again taken, it must appear that the public use to which it is to be applied is a more necessary public use. And under this statute it is not necessary that the new public use should, in all cases, be a different public use.

SAME—*Same—Absolute necessity not a prerequisite to the exercise of eminent domain.*—The word "necessary" as used in section 601, First Division of the Compiled Statutes, permitting lands appropriated for a public use to be again taken for a more necessary public use, does not mean an absolute necessity for the particular location sought, but a reasonable necessity to be determined from considerations of practicability, economy and facilities, under the particular circumstances of the case, having regard to senior rights and the benefits to the public.

SAME—*Same—Crossing and longitudinal taking.*—The fourth subdivision of section 600, First Division of the Compiled Statutes, provides that all rights of way shall be subject to be connected with, crossed or intersected by any other right of way and that "They shall also be subject to a limited use in common with the owner thereof when necessary." *Semble*, that the right of a railroad to condemn a portion of the right of way of another railroad, not in actual use, would not be limited to crossings or intersections only, but would extend to a longitudinal taking.

SAME—*Same—Conditions imposed on crossing.*—Where a spur of the defendant railroad, used for a particular mine, is on the north side of its track, while the mine is on the

south side, and the grade of the plaintiff's track is above the grade of the spur at the point of crossing and it would be more convenient for the defendant railroad to have the spur on the south side of their main track, the court will order the plaintiff road, at its own expense to rebuild the spur already constructed, upon the south side of the defendant's main track and provide suitable approaches to it for teams.

SAME—*Crossings—Difference of grades.*—Where there was a slight difference of elevation of grades of the two roads at the crossing of a spur of the defendant road and the on y practicable way of crossing was to raise the grade of the spur from the switch to the point of intersection, the court will order the crossing to be so made at the expense of the plaintiff road.

SAME—*Same.*—Where, in order for the plaintiff road to cross a spur of the defendant road without raising the grade of the latter's track, it was necessary to construct a reverse grade which made a "hump" in the road and which was objected to as dangerous in that it might cause the plaintiff's trains to break in two which would obstruct the defendant's tracks with wreckage, the court will not disturb the crossing as so constructed, it appearing that its dangerous tendencies were only indirectly to the defendant road and the evidence of skilled engineers as to the feasibility of the crossing was conflicting.

SAME—*Same—Damages for crossing—Commissioners.*—In condemnation proceedings by a railroad company to obtain parts of the right of way of another road the question of damages for crossings may be properly referred to commissioners, under section 607, First Division of the Compiled Statutes.

SAME—*Same—Watchmen at crossings.*—When the employment of a watchman is made necessary by one railroad crossing another, the road invoking the right to make the crossing should be allowed to select the watchman but should be required to bear his expense.

*Appeal from Second Judicial District, Silver Bow County.*

ACTION by a railroad company to condemn portions of the right of way of another railroad. Judgment was rendered for the plaintiff below by McHATTON, J.  Modified and affirmed.

Statement of the case by the justice delivering the opinion.

The plaintiff is a railroad corporation, duly incorporated under the laws of Montana. The defendant the Montana Union Railway Company is also incorporated under the laws of Montana. The other defendants are organized under the laws of other states.

The plaintiff alleges that it is authorized by its charter to construct, maintain and operate a line of railway from the city of Butte, Silver Bow county, Montana, beginning at a point near the terminus or depot of the Montana Central or Great Northern Railway, at or near the city of Butte aforesaid, and running and extending thence in a general westerly direction by way of the towns of Rocker and Silver Bow, in said county of Silver Bow, and through Silver .Bow canyon, to a point

near Gregson's Springs, and thence in a general northwesterly direction, skirting the westerly foothills of Deer Lodge valley, to the city of Anaconda, with such connections, branches and spurs to mines and smelting works and other industries in said counties as may be deemed necessary or proper.     That plaintiff is engaged in the construction of said main line of railway between the said cities of Butte and Anaconda, and also the branch and connection intended to connect on the east with the Mountain View spur and Montana Central Railway, and by means of that railway with the main line of plaintiff, at or near the Great Northern depot aforesaid, and also to connect directly with the main line of plaintiff at a point west of Butte city, to wit, at or near Rocker, and to extend to the various mines, mills and other industries situated along said branch, — all of said branch and the points above mentioned being in Silver Bow county, Montana.     That the public interest requires the construction of said railway, and the branch thereof above described, and that the lands proposed by plaintiff to be taken and condemned for the use of said railway are required and necessary for the construction and operation thereof, and for a right of way, tracks, side tracks and general railway uses of plaintiff.     That it is necessary to the construction and operation of said railway that the plaintiff should take, use and enjoy, for the purpose of a right of way for its branch railway above described, certain portions of land in Silver Bow county, and all being within the limits of the right of way claimed by the defendants herein for a railroad now being operated by the defendant the Montana Union Railway Company.     Then follows in the complaint an accurate description of the lands which the plaintiff wishes to use for right of way purposes. The description embraces a strip of land across the Nipper claim, and within the defendants' right of way; also a strip of land in the Last Chance addition to the city of Butte, and a portion of certain blocks of the Belle of Butte addition to the city of Butte; also a strip of land across the Clear Grit mining claim; also a strip of land across the Banker mining claim; also a strip of land across the Autocrat claim; also a strip of land

across the Oro Butte claim; also strips across the Pacific claim, the Poulin claim, the Humboldt claim, the Buffalo claim, the Little Mina claim, the Blackfoot claim, the Alexander claim, the Gambler claim, the Wake Up Jim claim and the Emma Abbott claim. Plaintiff alleges that the defendants claim or own an interest or right to the property above described, and more particularly set forth by metes and bounds in plaintiff's complaint, and that the Montana Union Railway Company has no interest in said premises, except an easement for a right of way for railway purposes, and that although the property is within the limits of the right of way claimed by the Montana Union Railway Company, it has never been used by defendants or any of them for any purpose, and is not necessary for their use for railway purposes, or for any public use, and that the use for which plaintiff seeks to condemn said property, and to which said property is to be applied by plaintiff, is a more necessary public use than any use to which defendants could put said lands or any part thereof.

The plaintiff further alleges that, in the construction of its said branch line, it is necessary that said branch line should cross and intersect the Montana Union Railway and certain spurs thereof. There are about twelve of these crossings,— one at the Modock mine; one over the spur leading to the Anaconda ore house, marked B on the map; another crossing over the spur leading to the Anaconda ore house, marked C on the map; a crossing over the spur leading to the Gagnon mining claim, marked D; also a crossing over the Haggin spur, marked E; also a crossing over the Buffalo spur, marked F; also a crossing over the spur leading to the Mountain Consolidated mine, marked G; also a crossing over the spur leading to the Green Mountain and Wake Up Jim ore houses, marked H; also a crossing over the spur leading to the ore house of the High Ore mine, marked I; also a crossing over the Haggin spur, leading to the High Ore Mine ore house, marked J; also a crossing over the spur leading from the Haggin spur to the boiler house of the Anaconda mine, marked K; also a crossing over the Haggin spur, near the timber shop at the Anaconda mine, marked L.

It is alleged by plaintiff that these various crossings and intersections proposed, are to be made in the manner most compatible with the greatest public benefit and the least private injury to the defendants, and that, as proposed, the crossings will not in any way interfere with the use, operation, or enjoyment by the defendants of their said railway lines or the spurs thereof.

Plaintiff further alleges that it has been unable to agree with the defendants as to the amount of compensation to be paid for the taking of the above-described premises and the construction of the crossings, and that the interest in the premises sought to be condemned for plaintiff's use is only an easement for a right of way for the construction, maintenance, and operation of its railway.

The plaintiff's prayer is for a judgment that the use for which plaintiff seeks to appropriate the premises is a public use; that the public interests require the construction of plaintiff's railway, and that the lands and the crossings proposed to be made are necessary for the purpose of said railway and said branch railway, and that the plaintiff has a right to appropriate the premises and make the crossings; that the court ascertain the interest of said defendants in the premises described and sought to be condemned, and that an order be made appointing three competent and disinterested persons as commissioners to assess the damages by reason of the appropriation of the said property, and that on the coming in of the report of the commissioners, the court make such order in regard to the possession of said property sought to be condemned as may be proper; and that, as to the crossings, the court adjudge, regulate and determine the place and manner of making the same.

The material points of defendants' answer are a denial that the public necessity requires the construction of plaintiff's railway and the branch thereof, as set forth, or that the lands therein proposed to be taken and condemned are required or necessary for the construction or operation of plaintiff's railway, or for any use connected therewith. Defendants deny that it is necessary to the construction or operation of plaint-

iff's railway that it should take for right of way purposes any portions of the lands within the limits of the right of way claimed by. the defendants, and as set forth in plaintiff's complaint; deny that the property, or any part thereof sought to be condemned, has never been used or that the same is not necessary for railway uses for defendants; deny that the use for which plaintiff seeks to condemn the property is a more necessary public use than any use to which defendants could put the lands or any part thereof. They deny the necessity of the crossings or intersections pleaded by the plaintiff and deny that such crossings are located in a manner most compatible with the greatest public benefit or least private injury to the defendants; deny that the proposed crossings will not interfere with the enjoyment of defendants' railway privileges.

The defendants then allege that the Oregon Short Line & Utah Northern Railway Company is the owner of these various pieces of ground described in the complaint as parts of the various mining claims heretofore referred to, and aver that all of said ground was obtained by grant, or by the exercise of the right of eminent domain, for the purpose of the construction of a railroad over the same, and for the operation of the Montana Union Railway, and that all of said ground became and was, and now is, absolutely necessary to the said defendants for the operation of said railway, and has always been used for such purposes by defendants, and defendants expect to continue to use the same, and that the same is absolutely necessary to defendants for railroad purposes.

Defendants further allege that plaintiff could easily, and at a slight increase of expense, construct its railway in a manner to avoid any conflict with or appropriation of any of the parts of the right of way of these defendants, but that the plaintiff seeks to appropriate a part of the right of way of defendants in order to save cost of acquiring right of way for itself, and not because said right of way is indispensable to the use of said plaintiff.

Defendants further aver that if plaintiff's railroad is constructed in accordance with the plan as laid out by plaintiff,

great and irreparable damage will be done them, and that, aside from the fact of dispossessing the defendants from their right of way, plaintiff seeks to cross the railway and spurs of defendants at points that will interfere greatly with the operation of the road of defendants, and that defendants' road cannot be economically, profitably, or properly operated, if plaintiff is allowed to construct crossings across its lines or spurs, as proposed by the plaintiff. Defendants further allege that by slight increase of cost, plaintiff could avoid all the crossings, and that it is not necessary that the crossing be laid · as plaintiff contemplates. It is further alleged that plaintiff has no right to enter upon the right of way or roadbed of defendants, except for necessary crossings or connections, and therefore has no right of condemnation over the right of way of these defendants.

The replication of plaintiff denies that all or any of the ground became or was or is at all necessary to defendants for railway purposes, or that it has ever been used by them for such purposes, or that the defendants expect to use the same; denies that plaintiff, at slight increase, could so construct its railway as to avoid any conflict with or appropriation of any parts of defendants' right of way, or that plaintiff seeks to appropriate the right of way in question to save cost to itself, or not because the said right of way is indispensable to the use of plaintiff; denies irreparable damage, or any damage; denies that the crossings will materially interfere with the defendants' operation of their railway, or that plaintiff could easily, or at all, avoid such crossings by slight increase of cost of construction; and denies that it is unnecessary that such crossing should be made as proposed by plaintiff; and, finally, denies that plaintiff has no right to enter upon the right of way or roadbed of these defendants, except for necessary crossings or connections, or that plaintiff has no right of condemnation over the right of way of these defendants, or any of them.

The cause was tried before the court, without a jury, in September, 1893.

The testimony taken before the court is quite voluminous,

and so much of it as is deemed pertinent and necessary to explain the decision of the court is embraced within the opinion following this statement.

The judgment and order of the court, after its more formal recitals, sets forth that the judge of the district court, with a civil engineer chosen by each party, inspected the premises before the submission of the case, and thereafter it was decided "that the use for which the property described in the complaint, and hereinafter described, is sought to be appropriated by the plaintiff, is a public use, within the meaning of the laws of the United States and of the state of Montana; that the entire quantity sought to be appropriated ought so to be taken; that the appropriation thereof will not be detrimental to the public interest or welfare, and is required and necessary for the proper prosecution of the enterprise for which it is sought to be appropriated, and that the public interest requires the prosecution of the plaintiff's said enterprise; that the premises so sought to be appropriated by the plaintiff are not necessary for the use of the defendants' railway, nor for any public use, and is not now in actual use by them, or any of them; that the use for which plaintiff seeks to condemn the same, and to which said property is to be applied by plaintiff, is a more necessary public use than any use to which the defendants have or could put said lands, or any part thereof. And, no sufficient cause having been shown why commissioners should not be appointed herein, it is hereby ordered that Clinton C. Clark, Justin Butler, and C. J. Stevenson, three competent and disinterested persons, residents of the said county of Silver Bow, be, and they are hereby appointed commissioners to ascertain and determine the amount to be paid by the plaintiff to the defendants as compensation for their damages by reason of the appropriation of said property. The right sought to be obtained in this proceeding is an easement for railroad purposes, in and over the following described tracts and parcels of land situate in the county of Silver Bow, state of Montana." The order particularly sets forth the ground embraced within the limits of the right of way of defendants,

as described in plaintiff's complaint, and sought to be appropriated by the plaintiff. It was further ordered and adjudged that the crossings and intersections described by plaintiff were necessary and proper.

After expressly granting the right to cross over the defendants' spur known as the "Gagnon Spur," on the Clear Grit claim, the court made the following proviso: "Provided, however, the defendants may, and if they do, within 10 days after the date hereof, give notice in writing to the plaintiff, that they consent to the plaintiff's taking up their entire Gagnon spur, aforesaid, and placing and rebuilding the same on the south side of the defendants' main track, opposite or about opposite its present position, then, in that case, the plaintiff shall, at its own expense, and, within a reasonable time after the giving of said notice, remove and place and rebuild the said spur on the south side of the defendants' main track, opposite or nearly opposite its present position, and make the same convenient to approach by and for teams and wagons, and provide proper approaches thereto; and provided, further, that, if such consent be not given within the time and in the manner aforesaid, then the plaintiff may and shall extend its road across such spur at the present grade of the plaintiff's road, and the plaintiff shall not be obliged to put in any crossing, and in such case the defendants, if they desire to operate said spur or use the same, shall make the same conform to the grade of plaintiff's road and track, and put in a crossing at the grade of plaintiff's track, and maintain the same, all at their own expense."

It was also ordered that the plaintiff might cross the defendents' spur known as the "Buffalo Spur" at an angle of 16 degrees, 48 minutes. In relation to this spur the court added as follows: "Provided, however, that the defendants may, and if they do within 10 days from the date of this order, notify the plaintiff in writing that they consent to permit the plaintiff to raise the entire grade of the said Buffalo spur so that the plaintiff can cross the same at its own grade, then, in that event, the plaintiff shall, before making said crossing, raise the grade of the whole of said spur, at its own expense,

so as to make a feasible crossing with its road, and leave said spur in a reasonable condition for the use of the defendants; and provided, further, that, if the defendants do not give such consent within the said time and in the said manner, the plaintiff shall make said crossing at its own grade, in as reasonably safe manner as the same can be done without raising the grade of the entire Buffalo spur aforesaid."

It was also ordered by the court, in relation to the watching of the crossings, as follows: "That, except as otherwise hereinbefore provided, all said crossings shall be put in by the plaintiff at its own cost and expense, and shall thereafter and forever be kept up, watched, and maintained at the joint expense of the plaintiff and the defendants; that is to say, one-half to be paid by the plaintiff, and one-half to be paid by the defendants, or the successors in interest of said parties or either of them,—that is to say, that each road shall assume and be liable to an equal obligation in these respects. That any improvements or repairs necessary to said crossings, or expense necessary on account of maintaining the same, may be made or incurred by one road at the equal expense of itself and the other, if, after reasonable notice to such other, the latter refuses to join in the same. That defendants shall not interfere with the plaintiff while putting in said crossings, nor in any manner hinder or delay the same. That at the same time the plaintiff shall put the said crossings in place in a manner which shall cause no unreasonable inconvenience or delay to defendants' business. And it is further ordered and adjudged that the defendants shall be entitled to compensation from plaintiff for the privilege of making said crossings, but that defendants shall not be entitled, on account thereof, to any compensation or damages for the interruption or inconvenience occasioned to their business thereby. * * * That the standard of compensation shall be the reasonable value of the common use by plaintiff with defendants of the portions of defendants' right of way occupied by said crossings. That the commissioners above named and hereinbefore appointed are hereby directed and authorized to determine and assess the value of said com-

mon use, subject to the restrictions above stated, and that, in making such assessment and determination of the amount to be paid by the plaintiff to the defendants on account of said crossings and common use, the said commissioners shall determine the amount to be paid for the common use of each crossing, separately, and shall in their report mention the same distinctly and separately.

"It is further ordered that the crossings, after being made, shall remain in the common use of both roads, and that both parties shall be required to observe all the laws of the state of Montana relating to the blowing of whistles, ringing of bells, and stopping at crossings. That neither party shall stop its engines, cars, or trains on any of the crossings, or so near thereto as to interfere in any manner with the operation of the other road. That neither party shall have a preference or right of way over the crossings, but that the party whose train first comes to the stop necessary to be made before crossing shall have the right of way of that crossing at that time. That in case trains on the different roads make such stops at the same time, or at or near the same time, or within 20 seconds of each other, the defendants' train shall have the right to make that crossing first. That no engine or train, in switching, shall be entitled to pass over a crossing more than once, if an engine or train on the other road be in waiting to cross, and the switching engine or train shall allow the waiting train or engine to cross before itself crossing again. That all needful signs and signals at and for crossings shall be constructed, erected, maintained, and operated jointly by the plaintiff and defendants, and at their joint cost and expense; provided, however, that in case it be necessary to employ any person or persons expressly for the operation of such signals, or any of them, plaintiff shall have the right to select, hire, and discharge such person or persons."

The defendants moved for a new trial, which was denied, and this appeal is prosecuted both from the judgment and the order overruling the motion for a new trial.

The following is a copy of the plat introduced on the trial: (See next page.)

MAP OF PART OF

# BUTTE HILL

MU. RY. LINES SHOWN THUS
B A. & P. RY.   "    "   "
CROSSINGS

*Shropshire & Burleigh* and *Forbis & Forbis*, for Appellants.

If the use to which the plaintiff proposes to put its road is not a public one, then it has no right to exercise any right of eminent domain, and consequently cannot appropriate any of the ground of these defendants, either for right of way or for crossings.    We hardly deem it necessary to assert that the provisions of our constitution relative to the exercise of the right of eminent domain and the crossing of one road by another refer only to roads constructed for public uses.    From the fact that the plaintiff's tracks on the hill parallel those of the defendants, and that the branches, side tracks and spurs extending therefrom, reach the same ore houses and mines of private individuals and mining companies, served already by the defendants, is a fact tending to show that the construction of the plaintiff's tracks as proposed, is not a public necessity nor use, much less a "more public use" than the defendants' tracks.    In some of the states laws permitting the construction of roads for the service of private interests, have been enacted and have been in some instances sustained by the courts.    As we have no such laws upon our statute books, it becomes unnecessary to discuss what effect such a law would have. With the exception of the decisions founded upon these statutes, there is so far as we know but one opinion of the courts, and that to the effect that railroads cannot condemn any kind of property for the purpose of constructing a road for private uses.   (*Pittsburg, W. & K. Co.* v. *Benwood Iron Works*, 2 L. R. A. 680, 31 W. Va. 710; *Weidenfield* v. *Sugar Run R. Co.*, 48 Fed. Rep. 615; *Denver R. L. & C. Co.* v. *Union Pac. Co.*, 34 Fed. Rep. 386, discussing constitution similar to ours as to public character of road; *C. & E. I. R. R. Co.* v. *Wiltsie*, 116 Ill. 449; Woods on Railway Law, Vol 1, 653, note; 3 Am. and Eng. R. R. Cases, 507; Lewis on Eminent Domain, 171; *In Re Rochester & G. N. R. Co.*, 12 N. Y. S. 566; *In Re Freibel.* 58 Hun. 601, 59 Hun. 617; *In Re Split Rock Cable Co.*, 12 N. Y. S. 116, 58 Hun. 351; S. C. 128, N. Y. 408, 28 N. E. 506; *St. L. I. & M. S. R. Co.* v.

*Petty*, 20 L. R. A. 434, (57 Ark.); *Kyle* v. *Texas & N. O. R. Co.*, 4 L. R. A. 275, (Texas App.); *Sholl* v. *German C. Co.*, 118 Ill. 427; *In Re Niagara Falls & W. R. Co.*, 108 N. Y. 375.)

The plaintiff has no right to infringe upon the defendants' right of way, either as a determined trespasser or under the guise of law. Admitting the uses of both parties to be public, the law has given no privilege to the plaintiff to appropriate the lands of the defendant already appropriated for public uses. (Lewis on Eminent Domain, 276; *Barre R. Co.* v. *Montpelier & W. R. R. Co.*, 4 L. R. A. 785; *I. C. R. R. Co.* v. *C. B. & N. R. R. Co.*, 122 Ill. 473; *L. S. & M. S. R. Co.* v. *M. C. & St. L. R. Co.*, 8 Fed. 858; *Contra Costa R. Co.* v. *Moss*, 23 Cal. 324; *Boston & M. R. R. Co.* v. *Lowell & L. R. R. Co.*, 124 Mass. 368; *Pittsburg J. R. Cos. Appeal*, 122 Pa. St. 533; *Sharon R. Cos. Appeal*, 122 Pa. St. 511; 3 Am. and Eng. R. R. Cases, 507 note; *Groff's Appeal*, 128 Pa. St. 634; Weed's Railway Law, Vol. 1, 672-681-688-689-691 and 692; *Mobile and G. R. Co.* v. *Alabama M. R. Co.*, 39 Am. and Eng. R. R. Cases 6; *In Re Providence & W. R. Co.*, 21 Atl. 965, (R. I.); *Fidelity T. & S. V. Co.* v. *Mobile St. R. Co.*, 53 Fed. 687.)

*M. Kirkpatrick, W. W. Dixon* and *William Scallon*, for Respondent.

Under the provisions of sections 5 and 7 of Article XV, of the constitution and the railroad incorporation act, section 680, Fifth Division of the Compiled Statutes, the plaintiff's railroad is a public highway; the public has a right to use it; it is throughout subject to legislative regulation and control, and therefore, its use is a public use, and this extends to all its branches, spurs and side tracks, whether they connect with a private industry or not. The true criterion by which to judge of the character of the use is whether the public may enjoy it by right or only by permission. The constitution is satisfied if the use is public, and the public may have the privilege of using the same. There is a great weight of authority in favor

of this proposition. (*Railroad Co.* v. *Railroad Co.* 32 N. J. Eq. 765; *Buffalo R. Co.* v. *Brainerd*, 9 N. Y. 100; *Beekman* v. *Saratoga R. Co.*, 3 Paige, 45; *Tracy* v. *Elizabethtown R. Co.*, 80 Ky. 259; *Moody* v. *Jacksonville R. Co.*, 2 Fla. 597; *Shaner* v. *Starrett*, 4 Ohio 494; *Re Killbrick Private Road*, 77 Pa. 39; *Sadler* v. *Langham*, 34 Ala. 311; *Warren* v. *Bunnell*, 11 Vt. 600; *Colorado Eastern R. Co.* v. *Union P. Co.* (C. C. District of Colorado), 44 Am. & E. R., Cas. 10, and note, page 24; *Chicago B. & N. R. Co.* v. *Porter*, 43 Minn. 527, S. C. 43 Am. & E. R., Cas. 170-172; *Kettle River R. Co.* v. *Eastern R. Co.* (Minn.), 40 Am. & E. R. Cas. 449, 41 Minn. 461; *Contra Costa R. Co.* v. *Moss*, 23 Cal. 323; *DeCamp* v. *Hilberma R. Co.*, 47 N. J. L. 43; *Phillips* v. *Watson*, 63 Ia. 28, 33; *In Palairets Appeal*, 67 Pa. St. 479, 5 Am. R. 450; *Philadelphia R. Co.* v. *Williams*, 54 Pa. St. 103; *Hays* v. *Risher*, 32 Pa. St. 169; Lewis on Eminent Domain, §§ 171, 164, 167; and see 20 L. R. A., page 434, note, where the cases are collected; 22 Am. Dec., pages 686–707, note; *Dock Co.* v. *Garrity*, 115 Ill. 155; *Mills* v. *Parlin*, 106 Ill. 60; *Truesdale* v. *Grape Sugar Co.*, 101 Ill. 561; *St. Louis & R. Co.* v. *Petty*, 57 Ark. 359; S. C., 57 Am. & E. R. Cas., 562–564; *Sherman* v. *Buick*, 32 Cal. 242.)

Again, in Montana, mining is the dominant industry; throughout a large portion of the state, and in the county of Silver Bow especially, it is the all important pursuit upon which all other industries are dependent. In the mining, smelting and reduction of ores the great mass of the population finds employment and support. The prosperity of the state is very largely due to the development of the mines. Under such conditions the business of mining is itself a public use; and this is recognized in the legislation of Montana, for, by the statute of January 4, 1872, which is a law of the state, the power of eminent domain may be exercised in aid of the development and working of mines. (Com. Stats., page 1058, §§ 1495–1507; C. C. P., § 598.) And the same has been ruled by the supreme court of Nevada, in a well considered case, under a constitutional provision the same as ours.

(*Dayton Manufacturing Co.* v. *Seawell,* 11 Nev. 394.) The court upheld the statute of Nevada authorizing the condemnation of property in aid of mining, remarking : "That the reasons for sustaining the act under consideration are certainly as strong as any that have been given in support of the mill dam or flowage acts, as well as some of the other objects heretofore mentioned." See also *Dietrich* v. *Murdock,* 42 Mo. 279; *Phillips* v. *Watson,* 63 Ia. 28; *Oreman S. M. Co.* v. *Corcoran,* 15 Nev. 147; *Hand Gold Manufacturing Co.* v. *Parker,* 59 Ga. 419–423; *Coal Company* v. *Coal Company,* 37 · Md. 562; *Getz Appeal,* 65 Pa. St. 1, 3 Am. E. R. Cas. 186; *Talbott* v. *Hudson,* 16 Gray 423; *Olmstead* v. *Camp,* 33 Conn. 546; *Ladd* v. *Austin,* 34 Conn. 79; *Great Falls Manufacturing Co.* v. *Fernald,* 47 N. H. 456; *Tide Water Co.* v. *Coster,* 18 N. J. 521; Cooley on Const. Lim., page 659; 12 Encyc. of Law, 940–2, 945; 1 Woods on Ry. Law, pages 654–653; *St. Louis & R. Co.* v. *Petty,* 57 Ark. 357, 57 Am. & E. R. Cas. 562; *Farnsworth* v. *Lime Rock R. Co.,* (Maine, 1891), 47 Am. & E. R. Cas. 64, 83 Maine 440. Therefore, we submit, that a railroad whose tracks run to the shafts and ore houses of great mining properties, such as are mentioned in the complaint, cannot be said to connect with mere private industries. Mining in Montana is a public use, and there is nothing in the constitution or statutes of the state which prohibits the plaintiff from condemning a right of way to such industries.

The court found : "That the premises so sought to be appropriated by the plaintiff is not necessary for the use of defendants' railway, nor for any public use, and is not now in actual use by them or any of them." This finding, we claim, is fully supported by the evidence, and it is unnecessary to repeat that it will not be disturbed by this court, if there is any substantial evidence to justify it. Taking it, therefore, as established that the land in question was not actually in use, and has never been used by defendants for railway purposes, and there being no probability that it would be required for such purposes by them, it follows that the premises sought to

be appropriated by the plaintiff are not and were not necessary to defendants for railway uses.    And thereupon the question arises, can such unused portions of defendants' right of way be legally appropriated by the plaintiff under the power of eminent domain for railroad purposes, the same being necessary to plaintiff for such purposes.    The affirmative of this question is, we think, well supported by the authorities.    In Montana the property rights of corporations are not more sacred or exclusive than those of private individuals.    (§ ·9, Article XV of the constitution.)    The general rule on this subject is clearly stated by Mr. Wood as follows :  " One public corporation cannot take the lands or franchises of another public corporation in actual use by it, unless expressly authorized to do so by the legislature, but the lands of such a corporation not in actual use may be taken by another corporation authorized to take lands for its use *in invitum* whenever the lands of an individual may be so taken, subject to the qualification that there is a necessity therefor. "    (1 Wood on Railway Law, page 684; 2 Wood (Miner's Ed.) page 856; *Baltimore & R. Co.* v. *P. W. A. R. Co.*, 17 W. Va. 812; 4 L. R. A. 790, note; *Colorado Eastern R. R. Co.* v. *Union Pacific R. R. Co.*, 44 Am. and Eng. R. R. Cases, 10, .18.)    Lands not actually employed by a railroad company in its business, but merely held as a speculation or to supply possible future wants, are liable to be taken like the property of private individuals.    (*N. Car & R. Ry.* v. *C. C. R. Co.*, 83 N. C. 489; 14 Am. & E. R. Cas., page 41, note; *Peoria, Etc., R. Co.* v. *Peoria, Etc., R. Co.*, 66 Ill. 174.)

Lands of one railroad company, not in use, or not necessary for the exercise of its franchise or the discharge of its duties to the public, may be taken by another company under a general power.    (9 Am. St. R., 144, note; *In Re N. Y. C., Etc., R. Co.* v. *M. G. L. Co.*, 63 N. Y. 326.)

Land appropriated by one railroad company under the power of eminent domain, but not required for the exercise of its franchise or the discharge of its duties, is liable to be taken for the corporate use of another railroad company.    (Cooley

on Const. Lim., page 652, note; and see *Cincinnati R. Co.* v. *Belle Center* (Ohio, 1891), 47 Am. & E. R. Cas. 72, 85, 48 Ohio St. 273; *Mobile, Etc., R. Co.* v. *Alabama M. Co.* (Ala., 1889), 39 Am. & E. R. Cas., 6, 11, 87 Ala. 501; and see same case again, 39 Am. & E. R. Cas., page 118; *United, Etc., R. Co.* v. *Dock Co.*, 52 N. J. Law 90, 44 Am. & E. R. Cas. 230; Lewis on Eminent Domain, §§ 267, 393,513; *Sioux City, Etc., R. R. Co.* v. *Chicago, Etc., R. R. Co.*, 27 Feb. 77; 25 Am. and Eng. R. R. Cases, 150.)

The order of the court in reference to the Gagnon spur crossing was correct.   (Fifth Division of the Compiled Statutes, §§ 600, 607; Constitution, § 5, Article XV; *State, Etc., R. R. Co.* v. *Minneapolis, Etc., R. R. Co.*, 39 Minn. 219; 35 Am. and Eng. R. R. Cases, 250, 259; *National Docks, Etc., R. R. Co.* v. *State, Etc., R. R. Co.*, 53 N. J. Law 217; 26 Am. St. Rep. 421; *Kansas City, Etc., R. R. Co.* v. *K. C., Etc., R. R. Co.*, 118 Mo. 599; 57 Am. & E. R. Cases 624; *East St. Louis, Etc., R. R. Co.* v. *E. St. L., Etc., R. R. Co.*, 108 Ill. 265; 17 Am. & E. R. Cases, 163, and note.) Also as to the Buffalo spur crossing. (*Chicago, Etc., R. R. Co.* v. *Kansas City, Etc., R. R. Co.* (Mo., 1892), 19 S. W. 826; 110 Mo. 510; 51 Am. & E. R. Cases, 542, note; *In Re Minneapolis, Etc., R. R. Co.* (Minn.), 39 N. W. 65; 39 Minn. 162.)

HUNT, J.—By this appeal we are called upon to decide questions of importance, not alone to the community at large, but especially so to railroad corporations, possessed of such powers as may be granted to them under the constitution and laws of the state.

The topography of Montana, as characterized by its name, renders it of unusual significance that the laws of eminent domain be correctly expounded at this comparatively early period of the development of the state.

The strict limits of all delegated authority to take the property of another must be cautiously and accurately guarded, lest private rights or those conferred be unnecessarily invaded. On the other hand, if the power to take has been delegated,

that power must be precisely defined and upheld by the courts, as one vitally affecting the material interests of the state.

The ways for railroads to reach remote mining camps, sometimes lying within small areas, upon precipitous mountain sides, at unusual altitudes, and in steep and rocky sections, are often very few, and only feasible at all by skillful engineering and vast outlays of money. Where, therefore, two or more railroads, in their mountainous routes, may seek the same objective mineral districts in view of their probably necessary juxtaposition, their rights must be carefully established with relation to the law as applied to the physical, as well as other and more general, conditions controlling them in their obligations towards one another and to the public as well.

Two main propositions are presented for review: First. Are plaintiff's road and branches public uses? Second. Can the plaintiff company construct its road within the defendants' right of way, and is plaintiff's use of the ground a more necessary use than that of the defendant companies, and is the ground sought to be taken necessary to plaintiff's use, and not necessary to defendants' use?

It is well established that if, in point of law, a use is public, the fact that not very many persons will enjoy the use is not material. (*Talbot* v. *Hudson*, 16 Gray 417.) The character of a way, whether it is public or private, is determined by the extent of the right to use it, and not by the extent to which that right is exercised. If all the people have the right to use it, it is a public way, although the number who have occasion to exercise the right is very small. (*Phillips* v. *Watson*, 63 Iowa 28; Lewis on Eminent Domain, p. 241; *Shaver* v. *Starrett*, 4 Ohio St. 496; *Kettle River R. Co.* v. *Eastern R. Co.*, 41 Minn. 461; Randolph on Eminent Domain, § 56.)

The circumstance that the plaintiff road was built by a private corporation, and that its branches run within convenient contiguity of private mines or ore houses, does not materially affect the road and give a private character to its use or to the use of its spurs. All termini of tracks and switches are more or less beneficial to private parties, but the public character of

the use of the tracks is never affected by this. "It may be in such cases that it is expected, or even that it is intended, that such tracks will be used almost entirely by the manufacturer; yet, if there is no exclusion of an equal right of use by others, and the singleness of use is simply the result of location and convenience of access, it cannot affect the question." (*Chicago Dock Co.* v. *Garrity*, 115 Ill. 155; *Chicago B. & N. R. Co.* v. *Porter*, 43 Minn. 527; *St. Louis & M. S. Ry. Co.* v. *Petty*, 57 Ark. 359; 20 L. R. A. 434.)

The force of these observations is peculiarly apparent in a new mining state. Frequently, railroads are extended by spurs or lateral connections of main lines, or by independent lines, into mining camps where but a single mine is developed and capable of shipping freight. Such roads or spurs are not infrequently built by the private enterprise of those interested in the one mine to be benefited, and when constructed it is intended that the tracks will be used almost wholly by the mining company which constructed the spur. The supposed barrenness of the country contiguous to the road, or the undeveloped condition of the mountain in which the mine is lying, or, perhaps, the hitherto unrewarded search of the prospector, has encouraged the belief that, apart from the single mine owned by those who have built the railroad, there are no other paying properties upon which a railroad might rely for ores or supplies to transport. Such expected limited uses are but the results of the location of the mine and its inaccessibility. They do not in any way, however, exclude an equal right of use by others, perchance, desiring to ship freight or secure transportation over the road. To better illustrate our meaning, we have only to modify the instance just referred to of the railroad lateral built to a single mine. Suppose that a pioneer prospector has located and represented a claim contiguous to such railroad, but by reason of the impracticability or expense of constructing a wagon road, he has been obliged to simply keep what he believed was a good mine, hoping that in the future railroad facilities would afford him the opportunity to haul his ore to market. Suddenly, by the enterprise of others, and without any

expectation on their part of aiding any project other than their own, a railroad is built, and he may attain the fruition of his hopes if he can use the railroad to ship his ore. Could it be contended with any merit that the railroad company, incorporated under the railroad laws of the state, can discriminate against him by saying, "We are a private enterprise, for private use, and are not generally open to the public, and for this reason refuse to haul your ore, or to bring your machinery and supplies into these hills, and you cannot compel us to act otherwise?" Or, to carry the illustration further, suppose many mines are located close to the new line of road, and a mining district opened of incalculable interest to the state, a town springs up, with its diversified trade relations, and that thus the railroad originally constructed and intended to subserve the single mine, with little or no thought of any greater use, may become a measure of great utility to many people; must this development stop, or be dependent upon the caprices or will or discriminatory orders of the incorporators or owners, based upon a claim that the road was constructed for private purposes, and cannot be made to answer the demands of the public?

We say, after full deliberation, that the express command of section 5 of article XV of the constitution, that "all railroads shall be public highways, and all railroads, transportation and express companies, shall be common carriers, and subject to legislative control," etc., supplemented by the statute (section 680, p. 809, div. 5, Comp. St. 1887) authorizing the construction of side tracks, branches, etc., has made them instruments of public service as well as private profit, and is sufficiently comprehensive to include, not only the railroad used to illustrate our views, but, by analogy, the particular railroads of appellants and respondents in their main lines, lateral branches, and spurs, to particular mines in and about the numerous mining dumps, shafts, and ore houses described in this suit, and situate upon the hills adjacent to the city of Butte. (*Getz's Appeal*, 3 Am. & Eng. R. Cas. 186.)

Furthermore, it is expressly provided by section 7, article

XV, of the constitution, that "all individuals, associations and corporations shall have equal rights to have persons or property transported on and over any railroad, transportation or express route in this state. No discrimination in charges or facilities for transportation of freight or passengers   *   *   * shall be made   *   *   * between persons or places within this state.   *   *   * No railroad or transportation company   *   *   * shall give any preference to any individual, association or corporation in furnishing cars or motive power, or for the transportation of money or other express matter." This provision, when considered with the previous one quoted, also demonstrates that the constitution, in its letter, its spirit, and its policy as well, classes all railroads, with their feeders, such as respondent and appellants operate, as public highways, subject to use by the public of right, amenable to the laws governing common carriers forever forbidding all obnoxious favoritisms between any who desire to use such highways. (*St. Louis & M. S. R. Co.* v. *Petty*, 57 Ark. 359, 20 L. R. A. 334.) This stable written policy is doubtless the outgrowth of pernicious systems of discrimination and preference which railroad corporations may have indulged in throughout the land where their powers are unrestrained by constitutional or other restriction. It puts them all on a plane, and under the facts before us, respondent and appellants, as public highways, are alike the beneficiaries of its liberality, subject, nevertheless, to its restrictions and liabilities.

Chief Justice Hawley, for the supreme court of Nevada, vigorously discusses a "public use," as meant by the constitution of that state, and concludes that the necessities of the business of mining, milling, smelting, etc., are of direct interest to the people of Nevada, and that a statute of that state is constitutional which authorizes land to be condemned for the necessities of such business. (*Dayton Mining Co.* v. *Seawell*, 11 Nev. 394.) This decision was afterwards expressly affirmed in *Overman S. M. Co.* v. *Corcoran*, 15 Nev. 147, and again recently approved by its learned author, in the United States circuit court for Nevada, where the court upholds a

statute authorizing the appropriation of land for a mining tunnel as a proper exercise of eminent domain, on the ground of "great benefit and advantage to the mining industry." (*Douglass* v. *Byrnes,* 59 Fed. 31.)

The supreme court of Georgia held in *Mining Co.* v. *Parker,* 59 Ga. 419, that a section of an act of the legislature incorporating a gold placer mining company, and giving it power, under the constitution, to take the private property of the complainants for the use of their ditch for the purpose of extending the same to their own land, on payment of just compensation therefor, was constitutional.  "Gold and silver," say the court, "is the constitutional currency of the country, and to facilitate the production of gold from the mines in which it is imbedded, for the use of the public, is for the public good, though done through the medium of a corporation or individual enterprise."

In a comparatively recent decision (*Oury* v. *Goodwin,* (Ariz.) 26 Pac. 376), the court sustained an act of the territorial legislature permitting the condemnation of appellant's real estate for the purpose of an irrigating canal, basing their opinion upon the principle that a state may, in view of its natural advantages and resources and necessities, legislate in such a way, exercising the power of eminent domain, that these advantages and resources may receive the fullest development for the general welfare, the laws being general in their operation.

The Nevada and Georgia cases have been disapproved of by Lewis on Eminent Domain (§ 184), but the disapprobation is based upon the ground that a law which granted a right of condemnation for a purpose singly and essentially private in its nature could not possibly subserve any public use or be of any public benefit, and hence is an invalid attempt to take private property for private use, and not upon the soundness of the argument that the magnitude of the interest of a state may be considered, for which alone we cite them. The reasoning of these cases, however imperfect the application to particular facts may have been, is well sustained. (Randolph on Eminent

Domain p. 50; Wood, R. R. p. 822;   Mills on Eminent Domain § 20; Cooley Const. Lim. 533; *Hibernia Railroad Co.* v. *De Camp*, 47 N.  J. Law, 518; 1 Rorer R. R. § 409; Comp. St. Mont. 1887, § 1495 *et seq.*)

The public interests are benefited by railroads, and the right of eminent domain may be exercised through the medium of corporate bodies.   The public have an interest in the use of the railroad, and the owners may be prosecuted for the damages sustained, if they should refuse to transport an individual, or his property, without any reasonable excuse, upon being paid the usual rate of fare.  (*Beckman* v. *Railroad Co.*, 3 Paige 45; Lewis on Eminent Domain § 170; *Dietrich* v. *Murdock*, 42 Mo. 279.)

Where the general public advantage is greatly promoted by the improvement of water power in the streams and waters of a country, private property taken for that purpose is taken for a public use, within the meaning of that term.   (*Hazen* v. *Essex Co.*, 12 Cush. 475.)   Indeed, in New England we find the courts very emphatic upon the question.   Chief Justice Perley, after speaking of the interests that New Hampshire had in the improvement of her natural water powers, wrote as follows:   "No state of the Union is more interested than ours in the improvement of natural advantages for the application of water power to manufacturing purposes.  Nature has denied to us the fertile soil and genial climate of other lands, but by way of compensation has endowed us with unrivaled opportunities of turning our streams of water to practical account.   The present prosperity of the state is largely due to what has already been done towards developing these natural advantages; and there is no assignable limit to our resources in this respect, if extended and connected enterprises for the improvement of the water power in the state should be sucessfully prosecuted hereafter.  In no part of the world have the public a, deeper interest in the success of all undertakings which promise to assist in the development of these great natural advantages. Whether, therefore, we look to the interpretation which has been given in other jurisdictions to the term *public, use,* in.

reference to the right of taking private property for such a use, to the legislative practice under the provincial and state governments before and at the time when the constitution was adopted, to the language of the constitution itself, to the early and continued legislative practice under the constitution, to the decisions of the courts in this state, or to the character of our business and the natural productions and resources of the state, we are drawn to the conclusion that the legislature have power to authorize a private right that stands in the way of an enterprise set on foot for the improvement of the water power in a large stream like this river to be taken without the owner's consent, if suitable provision is made for his compensation, and that the act of 1862 is constitutional and valid.'' (*Manufacturing Co.* v. *Pernald,* 47 N. H. 444; *Olmstead* v. *Camp,* 33 Conn. 532. See, also, *Scudder* v. *Falls Co.,* 1 N. J. Eq. 695; Mills on Eminent Domain § 183.)

So vital to the development of the agricultural interests of the state is water for irrigation that, as a part of the bill of rights of the constitution, it is provided:   ''The use of all water now appropriated, or that may hereafter be appropriated for sale, rental, distribution or other beneficial use, and the right of way over the lands of others, for all ditches, drains, flumes, canals and aqueducts, necessarily used in connection therewith, as well as the sites for reservoirs, necessary for collecting and storing the same, shall be held to be a public use.   Private roads may be opened in a manner to be prescribed by law, but in every case the necessity of the road, and the amount of all damage to be sustained by the opening thereof, shall be first determined by a jury, and such amount, together with the expenses of the proceeding, shall be paid by the person to be benefited.   (Const. Mont. art. III, § 15.)

The improvement of Boston harbor by reclamation of a large body of land for commercial purposes was held to be of great public advantage. (*Moore* v. *Sanford,* 151 Mass. 286.)

''The ever-varying condition of society is constantly pre-

senting new objects of public importance and utility, and what shall be considered a public use or benefit may depend somewhat on the situation and wants of the community for the time being." But the underlying principle remains, that there must be a public use or benefit. "But what that shall consist of, or how extensive it shall be to authorize an appropriation of private property, is not easily reducible to general rule." (*Scudder* v. *Falls Co.*, 1 N. J. Eq. 695; *Talbot* v. *Hudson*, 16 Gray 417; *Buffalo & N. Y. R. Co.* v. *Brainard*, 9 N. Y. 109.)

In thus ingrafting upon the law of this jurisdiction the doctrine that the magnitude of the interests involved may properly become a determining factor in sustaining the right of a railroad to construct lateral branches, tracks, and spurs to mines and mining works, as public uses, by virtue of the law of eminent domain, we are always duly mindful, not only of the constitutional guaranty of the individual right of possessing and protecting property, but are equally impressed with the declaration that "the good of the whole" is the very foundation of the constitution. Indeed, it may be said that upon this latter axiom of all government by the people rests the principle itself. The force of the principle may vary in different communities. What cogently applies to Montana, with its mountains and quartz, would be an absurd process of reasoning to urge in Louisiana, where scarce an undulation marks the surface, or a mineral lies beneath it. Therefore, to correctly define what that force is in the case before us, it is eminently reasonable and appropriate that the conditions of the whole people to be affected should be considered. In this state, where, almost wholly through the facilities and advantages of railroads, the quartz mines have been developed to such an extent that the mineral output is only exceeded by that of one or two older mining states, the publicity of the use of railroads into the camps is too obvious to require more extended comment. In the language of the eminent counsel who so lucidly presented respondent's side of the case: "Again, in Montana, mining is the dominant industry. Throughout a large portion of the state, and in the county of

Silver Bow especially, it is the all-important pursuit, upon which all other industries are dependent. In the mining, smelting, and reduction of ores the great mass of the population finds employment and support. The prosperity of the state is very largely due to the development of the mines."

Having determined that the respondent's railroad and laterals, branches and spurs are all public highways, within the legal bounds of public uses, it follows that the law of eminent domain was available to them, provided : "(1) The use to which the respondents have applied the ground taken is a use authorized by law. (2) That the taking was necessary to such use. (3) If already appropriated to some public use, that the public use to which it is to be applied is a more necessary public use." (Code of Civil Procedure, § 601.)

That a necessity exists which requires property to be taken is obvious. This follows as a conclusion of the determination that the purpose of the plaintiff is a public use. (*Moore* v. *Sanford*, 151 Mass. 286.) But, insist the appellants, although we grant a right of way is necessary, if it is held that the Butte, Anaconda & Pacific Railway is a public use, nevertheless, at the very threshold of this branch of the case we deny the necessity of the particular land for the railroad uses for which respondent seeks to appropriate it.

The district court found that the ground included within the defendants' right of way was necessary to the plaintiff for the proper construction and maintenance of its road, that such ground was not necessary for the use of defendants' railway, and was not in actual use by them at the time of the order, and that the use for which the plaintiff sought to condemn the same was a more necessary public use than any use the defendants have or could put the same to.

Without more prolixity than we think is essential to make clear our opinion, we will state the concluded facts apparent to us. The country through which the contending railroads run is one of the mountains of the main Rocky Mountain range, and known as the "Butte Hill," above the city of Butte. The railroads about the hill are really great broad-gauge spurs

of their respective main lines. From these great spurs many short ones project, running to ore house or mining shafts. The principal object of both railroads, in their branches about the "Hill," is to haul ores from and supplies to the several quartz mines indicated upon the map, to wit, the St. Lawrence, Anaconda, Wake Up Jim, Buffalo, Moscow and others. The Butte, Anaconda & Pacific (respondent) tracks for the most part lie north of the Montana Union tracks. The Montana Union right of way was twenty-five feet on either side of the center of its tracks. It had, however, graded along the hill only to an extent a little more than necessary for the actual space occupied by its roadbed. In many places the hill is so very steep, or so rocky, or both, that the rails must have laid very close to the bluffs just north of the tracks. There was no actual use of such bluffs or other ground adjacent to the Montana Union tracks, nor could it actually occupy the same without heavy excavation work on the upper side. Commencing at a point on the hill within the limits of the Nipper quartz mining claim, the Butte, Anaconda & Pacific, with its road, was graded and excavated on the upper side of appellants' roadbed, and is within the right of way of the Montana Union for about a mile and a half. At places the south rails of the Butte, Anaconda & Pacific road are within ten feet of the northern rails of the Montana Union, but as a rule there is some seventeen to twenty-two feet between the centers,—that is, from the center of the Montana Union tracks to the center of the Butte, Anaconda & Pacific tracks. These distances, excluding the crossings, are sufficient to prevent any interference between the successful operation of the two roads. The strips of ground which the plaintiff would condemn and appropriate vary in width, the variance being evidently based upon what the plaintiff deems necessary for the operation of its road, considering the points to be reached, and the distance which would and must separate the two roads when constructed. Prior to the institution of this action,—that is, in 1893,—various lines and means of getting to the several ore houses marked upon the map were projected.

All these ore houses are at the same level as to the grade of the two roads; several of them, however, being below the level of the Montana Union main track.   By the abrupt rise in the hill and its rocky character, and because of the necessity of the Butte, Anaconda & Pacific crossing divers spurs of the Montana Union, it is necessary that the right of way of the Butte, Anaconda & Pacific be laid down to the same level as the Montana Union.   This necessity could only be obviated by requiring the Butte, Anaconda & Pacific to either cross the spurs of the Montana Union at grade, or construct its road high enough to go overhead or low enough to pass beneath the spurs.   To go under them would require the plaintiff to undertake an engineering task so far beyond what is deemed practicable or reasonable that it need not be considered at all.   To build its line overhead would compel the Butte, Anaconda & Pacific to construct its road at more than twenty feet above the crossings, so that, when it passed the ore houses which the two roads go to, the plaintiff's road would be useless, unless, after running beyond the ore houses, switch backs were constructed down the hill, by which they could reach the objective points. To follow this plan would require the plaintiff to run into the mountain at points beyond the ore houses, at enormous expense of construction, and right of way, probably; and the road, when thus constructed, would be very impracticable to successfully run or operate.   If the Butte, Anaconda & Pacific constructed its line above the Montana Union, it follows that the cuts through which it would have to run would be very much heavier than its present line, and at their objective points it would still be necessary for the two roads to be within a few feet of one another.   Another objection to running higher up the hill is that such a route would materially interfere with the operation of the mines on the mountain.   In such case shaft houses would be cut through, dumping grounds intersected, and quartz-mining operations seriously interfered with. The route chosen was deemed by far the most feasible and practicable one.   Other routes could have been selected, according to the engineers' evidence, but any practicable one

which might have been chosen would have crossed the main line of the defendants, as well as many of their spurs. The plaintiff, by going upon the right of way of the defendants, widened the cuts which defendants had already made in many places, but when we consider that the hill had remained in its natural state until further excavated by the plaintiff, it is plain that no material damage was done to the defendants by the plaintiff by the mere act of excavating as it did. On the contrary, such excavations are a benefit from a mere standpoint of construction. Upon one part of the right of way, lying within the Belle of Butte addition to the city of Butte, the natural physical obstacles to selecting another route were not so great as higher up the hill; but, in order to conform with the grade necessarily chosen to reach the point higher up the hill, the most practicable route was that selected through the Belle of Butte addition, particularly in view of the fact that, had they kept off the right of way of the defendants, the plaintiff would have been compelled to pay for a number of dwelling houses and the lots which they were on, and other parts of their line would have been affected.

An experienced engineer, Mr. N. C. Ray, testified in behalf of the defendants that he had, at a time long prior to the institution of this suit, and at a time when there were not so many houses about the foot of the hill, and not so many mines developed and ore houses built on the mountain, made a survey for another railroad, with a view of finding a practicable route. His proposed line ran on the south or lower side of the present Montana Union track. It was proposed by this route to make most of the crossings of the Montana Union spurs grade crossings. It appeared also that the Ray route, if followed, would necessitate for a long distance a retaining wall to be put up to maintain the slope of the Montana Union roadbed, and to keep it from falling over on the proposed roadbed. It would require very heavy fills or trestlework, and, withal, a scale of a map made when this projected route was first surveyed showed that there was not two hundred feet difference in the longitudinal conflict between the Ray route

and the present Butte, Anaconda & Pacific route and the Montana Union right of way, as they appear on the maps. The total length of the present lines is about three miles, or a little less. From certain given points there was, between such proposed route and the actual route of the Butte, Anaconda & Pacific, a difference of three-fourths of a mile, the greater length being the Ray route. The Ray route necessitated five grade crossings of the main track of the Montana Union, all of which, it satisfactorily appears, were more undesirable than an equal number of crossings would be over spurs. Moreover, the Ray line, if run at the time this litigation first arose, would have encountered buildings, shaft houses and dwelling houses which were not in existence when the line was first proposed. It would have been vastly more expensive, by reason of the enhanced value of the right of way, and we think it only fair to say that, as the conditions existed at the time that the testimony was taken in this cause, his route was impracticable. Moreover, the Ray route was not projected with a view to serving all of the the various ore houses touching plaintiff's and defendants' roads; the only branch appearing on the Ray map being to the High Ore house, and a branch to the Anaconda and the Humboldt.

One of the objections interposed by the defendants to the occupancy of their right of way was the difficulty of throwing out switches or side tracks to the north of the Montana Union, but the engineers swear that if they have distances to centers between tracks of twenty-two feet, there is room between the two tracks for another track, and if the Butte, Anaconda & Pacific elevation is so high that the Montana Union cannot get over by crossing at right angles, a spur can be run at any distance in order to attain the proper elevation.

Another objection vigorously urged was the difficulty of handling ties where the roads were very close together. But it appears that some of the greatest railroads in the country, notably the Pennsylvania system, have three tracks abreast, with centers of the two outside tracks twenty-two and one-half feet apart. Ties are successfully handled on such roads,

and we see no reason why they should not be upon the roads of the contending parties at bar. Besides, the hill, as it stood, was certainly a much greater obstacle to necessary conveniences in this respect than it is as excavated to a level with appellants' roadbed.

It was also urged that the right of way taken by the defendants was necessary in case of future double tracks or sidings, but as these needs are mere future possibilities, not based upon reasonably apparent traffic needs, we do not think the showing is strong enough to merit very serious consideration.

A great deal of testimony was also taken upon the inconvenience to the defendants in the operation of their trains at various crossings where the construction of plaintiff's road prevented the defendants from handling as many cars at one time as they could handle if the plaintiff's road were not in their way. Eliminating the consideration of the Gagnon, Buffalo, and Haggin spur crossings, which are referred to hereafter, we are constrained to hold that, as the law expressly gives the right of crossing and intersecting (Const. art XV, § 5), the interference is only such as is essential to any method of operation of two railroads where they cross and intersect one another on the side of a mountain, where their respective ways are necessarily very limited, and where both may have lawful rights of way to their respective but identical objective points.

It is well to bear in mind, in the application of the principles underlying the law of eminent domain, that the state has an inherent political right, pertaining to sovereignty and founded on what has been expressed to be a "common necessity and interest," to appropriate the property of individuals to great necessities of the whole community where suitable provision is made for compensation. (*Raleigh* v. *Davis*, 2 Dev. & B. 451; Lewis on Eminent Domain § 3.) This right, says the constitution of Montana (§ 9 art. XV), "shall never be abridged nor so construed as to prevent the legislative assembly from taking the property and franchises of incorpor-

ated companies and subjecting them to public uses, the same as property of individuals.'' The public welfare is therefore the particular base upon which must be laid the correct application of the doctrine itself. The right of eminent domain may be of the greatest value to the respondent, or to any other corporation which may exercise its privileges, but that is an incident which must be subordinated by the courts to the question of public use, and to the consideration of the benefits to accrue to the public by the construction of the contemplated project. There is, however, a rule of construction, sustained by the great weight of well-considered authority, to the effect that this power to take the property of private citizens or other corporations for public use must be exercised and can be exercised only so far as the authority extends, either in terms expressed by the law itself, or by implication clear and satisfactory. (*In re City of Buffalo*, 68 N. Y. 167; Sutherland on Statutory Construction § 388; Mills on Eminent Domain § 46.)

In our opinion, the testimony in this case shows that the particular location of respondent's railroad is by far the most practicable which could have been found, and, considering the fact that any other route would have impinged upon the appellant's right of way very nearly as much as the present route does, and that such other route would have affected many mining operations, would have been enormously expensive, and much less convenient or somewhat less safe, and that it is manifestly to the best interests of the public generally that railroads be constructed throughout the mountains over such routes as will enable the public to receive the best and most expeditious service which can be attained, we think that the taking of the portions of the right of way of appellants' road was necessary to the use, which was public, of the respondent's railroad.

Now, however, having advanced to this point of the case, we are met with this argument by the appellants' counsel, namely, that this right of way was already appropriated, and that there was no delegation of power to any corporation under the emi-

nent domain laws of the state to take property already appropriated to a public use, unless, as provided by the last clause of the third subdivision of section 601, Code of Civil Procedure 1887, "the public use to which it is to be applied is a more necessary public use." We have already concluded that this land was necessary to respondent's use, and the question therefore is, is respondent precluded from condemning these necessary lands because they have already been condemned for public use by the appellants? If the question were limited merely to this single inquiry (unless some other statute authorized a taking), doubtless, under rules of construction, we should hold that the respondent could not invade the right of way of the appellants. But our legislature has imposed upon the court the additional responsibility of judicially determining whether the use to which the appellants did or would put the particular lands is a more necessary one to the public than that to which they have already been appropriated by the Montana Union Railway. We therefore find the whole proposition resolves itself under the facts to this: A part of the right of way of the Montana Union Railway Company has never been used by it for railroad purposes for the several years during which the road has been constructed and in operation, and is not reasonably requisite for future uses. The Butte, Anaconda & Pacific Railway Company, in the location of its only really practicable route, desires to take parts of such unused portions of the Montana Union right of way; such portions being necessary for their actual use, and unnecessary for the actual use of the appellants.

We have used the word "necessary" advisedly throughout this opinion, although when we say that the route chosen by the Butte, Anaconda & Pacific requires the taking of the lands in question as necessary for public use, we do not mean that there is an *absolute* necessity of the particular location they seek. But, under the statute, such an absolute necessity is not a prerequisite to the exercise of the law of eminent domain.

We are aware of the decision of the supreme court of Pennsylvania (*Sharon Railway Co's Appeal*, 122 Pa. St. at page

545), that land once appropriated by a railroad company to public use under the right of eminent domain cannot afterwards be appropriated by another company to the same use, except in case of "absolute necessity." There one oad sought to take part of the yard of another. The facts warranted a finding by the master that the lands sought to be taken were convenient and necessary to enable the plaintiff company to economically and expeditiously carry on its present and prospective business, and it was upon such a finding that the court held as it did. If the learned judges meant by an absolute necessity to exclude entirely the element of reasonableness in the measure of their words, we are constrained to take a different view of the law in interpreting our statute, and in so doing we find ourselves in thorough accord with three of the justices of the same court in their dissenting opinion, reported in *Appeal of Pittsburgh J. R. Co.*, 122 Pa. St. 511, and decided just two years before the absolute necessity rule was laid down in the case hereinbefore cited. The appeal in the *Pittsburgh Junction Co.* case in its facts was much closer to the case at bar than *Sharon Railway Co.'s Appeal, supra.* The Allegheny Valley Railroad Company claimed to own certain property in the city of Pittsburgh, extending from Forty-Third street to Forty-Seventh street, and from an unnamed street on the south to low-water mark on the Allegheny river on the north, all of which property it claimed to have in constant use in connection with the operation of its railroad. The Pittsburgh Junction Company entered upon a part of this property, and commenced to lay ties and rails thereon, and to tear up the track that had been used by plaintiff for many years, and it was alleged that, if the defendant was permitted to go on, it would seriously interfere with and cripple the operation of the plaintiff's road, and would ruin its roadbed, and render it unable to perform the duties imposed upon it towards the public. The defendant contended that it was authorized to locate its road between certain points, and it was obliged to run along the bank of the Allegheny river, and that it had a right to run where it did, and denied that all of the

property used by the plaintiff in connection with the maintenance and operation of its railroad was used, or that it was all indispensable to plaintiff's use. The supreme court held that the plaintiff road could consider the needs of the future, and that the defendant could not interfere with the present or future use contemplated by the plaintiff, and that no actual encroachments would be allowed. Perhaps the decision turned, in the opinion of the majority of the court, upon the ground that the defendant could have, without any trouble besides expense, constructed its road at another point, as the court say : " We are not embarrassed with the questions that would arise if the defendant company could not build its road without laying its track through the plaintiff's yard." The minority opinion by Judge Tounkey is very brief, and we quote so much of it as is applicable to the facts at bar : "In this case the testimony clearly shows, and it was so found by the master, that there is ample room next the river where the appellant could lay its tracks without material injury to the property of the appellee. The inconvenience to and cost of changes by the appellee could be compensated in damages. The prudent appropriation of a parcel of land extending from low-water mark on the river to the hillside by the appellant, the whole of which land is not necessary for the uses of its road, ought not to bar the construction of another railway in the valley by a company subsequently chartered."

About the same time that the Pennsylvania rule of absolute necessity was announced, the supreme court of Alabama, in *Mobile & G. R. Co.* v. *Alabama M. R. Co.*, 87 Ala. 501, discussed, with a learning which generally characterizes the decisions of that respected court, the right of a railroad company to take by condemnation proceedings part of the property of another railroad company already devoted to a public use, and say : "As a general rule, a corporation to whom the right of eminent domain is delegated, having the right to locate the line of its road between the terminal points, has also the correlative right, to some extent, to select the lands to be taken. But the discretion must be reasonably exercised, so as to cause

as little damage as is practicable; and if abuse in the selection is made apparent, the court before whom the proceeding is pending should interfere to control the discretion, and prevent the abuse by refusing an order of condemnation.  (*New York Central & H. R. R. Co.* v. *Metropolitan Gas-Light Co.*, 63 N. Y. 326; 6 Am. and Eng. Enc. Law, 541.)  According to the rule stated above, the liability of any portion of the right of way of the Mobile & Girard Railroad Company, though not in actual use, to condemnation for the use of the Alabama Midland Railway Company, is subject to the qualification of a necessity therefor.  It would be difficult to lay down any specific rule, as to the measure of the necessity, of sufficient scope to include all cases.  It may be observed generally that *necessary*, in this connection, does not mean an absolute or indispensable necessity, but reasonable, requisite and proper for the accomplishment of the end in view, under the particular circumstances of the case.  On the evidence, there is little room for doubt that the route selected by the Alabama Midland Railway Company to get into the city of Troy and out to the west is the most practicable, if not in its proper sense the only practicable, route.''  (*Anniston & C. R. Co.* v. *Jacksonville, G. & A. R. Co.*, 82 Ala. 297.)

Again, the absolute necessity rule not only will not consist with the express delegated authority to take the property of a corporation by virtue of eminent domain, but, if we carry it to its logical results, it is this, that where one corporation to which has been granted the right of taking property by eminent domain has exercised that right, it cannot be interfered with, except for crossings and intersections.  This is fallacious. In mining districts it leads to exclusion.  When a similar question arose in Illinois, Judge Breese, for the court, thus tersely disposed of it:  ''The argument, when reduced to its proper measure, is that, while the land of all other persons and corporations lying on the route of a railroad is subject to the power of eminent domain, that belonging to a railroad company is not thus subject.  Such land must remain intact. We cannot assent to this proposition.''  (*Peoria, P. & J. R. Co.* v. *Peoria & S. R. Co.*, 66 Ill. 174.)

We find the federal court for the district of Colorado taking substantially the same view of the necessity rule as the Alabama court did. (*Colorado E. Ry. Co.* v. *Union Pacific R. Co.*, 41 Fed. 293.) The Colorado Eastern Railway Company sought to condemn certain property within the limits of the city of Denver, claiming that the ground was necessary for its use for various railroad purposes. The defendant contended that the land was not of such necessity to the plaintiff as to justify the taking from defendant, and that the land had already been appropriated by defendant to its own use as a public railroad, and was eminently necessary to its prospective business. Philips, J., decided that the ground was necessary to the petitioner, because it was the only piece of ground available to the petitioner without entirely changing the survey line and undertaking to accomplish its destination by a circuitous route, and that it would not be a wise judicial discretion to compel the petitioner to adopt a road highly inconvenient, longer, and less available. It was plain in that case that another route could have been selected, and, aside from the matter of economy, with very much more ease than could the respondent, in the case at bar, choose another route for the Butte, Anaconda & Pacific road; but the court evidently refused to follow the absolute necessity rule, and based its decision upon the more just doctrine of the necessity of the petitioner, founded upon the practicability, economy, facilities, and other considerations which should govern the determination of what the necessities may be, always considering the rights of the senior company, yet never forgetting the benefits to the public.

The laws of the state authorized the respondent to locate its railroad. It had a right to select the most feasible route, provided in doing so it did no unnecessary injury to the public or to the appellants. The law does not give to the respondent any predominent right over the appellants, though certainly the line of respondent should be so run as not to materially interfere with the efficiency of the Montana Union. (*New York, H. & N. R. Co.* v. *Boston H. & E. R. Co.*, 36 Conn. 196.)

We find no violence done to these principles. The inconveniences inevitably incident to the crossing of one road by another are not violations of the principles. On the other hand, lands belonging to the Montana Union by way of easement and not actually in use by such company, or not actually necessary for the enjoyment of their franchise, should be upon the same footing as the land of the individual citizen. (*Pecria P. & J. R. Co.* v. *Peoria & S. R. Co.*, 66 Ill. 174.)

It was never contemplated by the constitution that competition between railroads should not be sanctioned. On the contrary, our construction of the law is that it is the policy of this state, voiced in its constitution and statutes, to build up competing roads, rather than to deter them. If this were not so, why did the legislature expressly include the right to take lands already appropriated by one corporation and devote them to public use where the latter use was a more beneficial one than the former? The mere fact that the easement is held by a corporation, and that another corporation takes it to subserve public use, cannot affect the principle so long as the second taking is for the greater public good. (*Northern R. Co.* v. *Concord & C. R. Co.*, 27 N. H. 183.) Nor can the claim of a superior equity of respondent be urged as a sound argument, based upon the fact that the appellants already have appropriated the property for public use. (*Chicago, R. I. & P. R. Co.* v. *Town of Lake*, 71 Ill. 333.)

The Montana Union accepted its easement with the reserved right in the state to retake it whenever the public necessity might require, provided, always, just compensation should be made when it might be retaken.

One public corporation cannot take the lands or franchises of another public corporation in *actual* use by it unless expressly authorized to do so by the legislature. But the lands of such a corporation not in actual use may be taken by another corporation, authorized to take lands for its use *in invitum*, whenever the lands of an individual may be taken, subject to the qualification that there is a necessity therefor. (2 Wood R. R. p. 856.)

544      B. A. & P. Ry. *v.* M. U. Ry.      ]June T. '95

We think this to be the true rule, and that opposing corporations may be limited to the enjoyment of that property in *actual* use by them, and that which is reasonably necessary for the safe,· proper and convenient management of their business, and the accomplishment of the purposes of their creation. (*Mobile & G. R. Co.* v. *Alabama M. R. Co., supra.*)

Upon this proposition we again refer to the opinion of Judge Philips (*Colorado E. Ry. Co.* v. *Union Pacific Ry. Co.*, 41 Fed. 293), where it was held "that mere priority of acquisition, or even of occupation, gives no exclusive right, except in so far as the condemnation trenches on the greater necessities of the other franchise." As has been stated heretofore in this opinion, the right of way prayed for by the respondent in this case was not occupied, and the mere priority of the acquisition of the Montana Union must give way, under our laws, to the superior uses and greater needs of the Butte, Anaconda & Pacific Company, as more necessary to the public.

The learned counsel for the appellants have cited us to many cases besides the Pennsylvania ones already referred to. We will notice one or two principal ones. *Barre R. Co.* v. *Montpelier & W. R. R. Co.*, (Vt.) 17 Atl. 923, simply decided that one railroad company, to avoid a sharp curve in its road, could not take the land of another company, as condemnation was sought upon the ground of convenience rather than necessity. We find nothing in the case to the effect that if the necessity existed still the ground could not be taken.

*Boston & M. R. Co.* v. *Lowell & I. R. Co.*, 124 Mass. 368, was decided upon the ground that there must be an express legislative grant to authorize a longitudinal road to be built upon the right of way of another road, and that the statutes did not contemplate such a taking, but the court recognized that cases may arise where the authority to take land already devoted to another railroad may be implied, either by the language of the act or from the application of the act to the subject-matter, as. where the railroad could not be laid, in whole or in part, by reasonable intendment, òn any other line.

We are cited by the appellants to the case of *Illinois Cent.*

*R. Co.* v. *Chicago, B. & N. R. Co.*, 122 Ill. 473, 13 N. E.
140.   In that case one railroad sought to run within the right
of way of another for a distance of eleven miles.   A majority
of the court held that one company could not take any part of
the right of way of another except at a point of crossing, in-
tersection, or union.   The Illinois statute granting rights of
way to railroad companies was substantially like the first por-
tion of the fourth sub-division of section 600 of the laws of emi-
nent domain (Comp. St. Mont. 1887, page 216), which is as
follows :   ''All rights of way for any and all purposes men-
tioned in section 598, and any and all structures and improve-
ments thereon, and the lands held or used in connection there-
with, shall be subject to be connected with, crossed or inter-
sected by any other right of way, or improvements or struct-
ures thereon.''

It was argued to the court that the provisions of such a stat-
ute were broad enough to permit the taking of the right of
way of one company by another, but it was decided that the
taking contemplated was limited to crossings, intersections or
unions, and not taking for another road longitudinally.   Two
judges dissented from that opinion, and although we do not
find it necessary to approve or disapprove of the law of that
case, we note that our statute seems to go further than the
Illinois law, for with us it is expressly provided, in the latter
part of the section just quoted :   '' They shall also be subject
to a limited use in common with the owner thereof when neces-
sary; but such use, crossings, intersections and connections
shall be made in a manner most compatible with the greatest pub-
lic benefit and least private injury.''   If the property to be sub-
ject to limited use in common with the owner means, gener-
ally, rights of way, longitudinal as well as others, and the
statute does not restrict the application of the pronoun ''they''
to rights of way immediately connected with crossings and in-
tersections, but enlarges the use of all rights of way when
necessary, it would seem by no means unreasonable that con-
ditions like those presented in the case under consideration
were in the minds of the legislature at the time that this sec-

tion became a law, and that of necessity all rights of way shall be subject to a limited use in common with the owner thereof.

Perhaps the statute may have meant, by using the word "owner," the owner of the fee, to whom all rights in the property might revert if there were no longer any public use thereof, or it may mean the easement for use of the corporation which had acquired an easement over the property by virtue of the law of eminent domain. We simply refer to this matter in view of the citation made.

From the decision in the case of *Railroad Company* v. *Moss*, 23 Cal. 323, it appears the court did not consider the effect of any statute similar to ours granting the right to take land once appropriated, if indeed there was any such statute in existence in California when that decision was rendered in 1863. It was held that there was no right to condemn or appropriate land along or upon a previously located line of another railroad company, except for crossing purposes. The court announced that, by its priority of location and appropriation, a railroad company acquired a "vested right to its line of road and the land necessary for its construction, as prescribed by the railroad laws, of which it cannot be divested by another company who seek to appropriate the land for the same use." We must decline to assent to this proposition as it is stated, without careful qualification and modification.

We cannot agree that the statute which authorizes lands to be appropriated for a more necessary public use means a different public use in all cases. If the legislature had intended that construction to be put upon the statute, instead of carefully restricting the right to a more necessary public use, they could easily have said a different public use. Besides, the view which we have discussed is consonant with those clauses of the constitution inhibiting discriminations, as already enumerated. If the appellants' construction were adopted, the practical result would be the exclusion, oftentimes, of more than one railroad on mountain sides or in mountain gorges or precipitous gulches, or routes not embraced within the definitions of canyons, defiles, or passes, especially pro-

vided for by law.   (Comp. St. 1887, div. 5, § 688, tit.
"Railroad Corporations.")   Consider a practical application.
A railroad company would take the maximum right of way.
Now, if the right of eminent domain is not conferred upon the
junior company to take lands for a public use, unless for a dif-
erent use, the first railroad would be enabled to prevent any
and all competition, because, oftentimes, any route off the right
of way of the first would be, if not an absolutely impassible
one, so impracticable and so enormously expensive, that it
must as a reasonably necessary consequence deter another cor-
poration from building at all.

To conclude, we adopt that construction which is more jeal-
ously careful of the best interests of the state, and say that,
where a railroad company traversing the side of a mountain in
a mining section has within its right of way tracts of ground
not necessary to the proper, successful, and safe operation of
its system of tracks and spurs, and not used by it in connec-
tion with any such operations, and in all reasonable probability
not necessary for any such future use, if another road seeks
the same objective points, and in doing so is obliged to take
part of such unused right of way to avoid a considerably more
circuitous route, at a different grade, of very much greater
cost, and of serious damage to many mining properties in their
subterranean and surface operations, and withal would be
obliged by the topography of the mountains to parallel the ad-
versary road a part of the way, under such conditions the use
of the unused parts of the right of way of the one company by
the other is a more necessary public use than that to which
such unused portions are already appropriated.   Wherefore,
the law will permit the taking, regarding the interference as a
"tolerable one," to be compensated by damages to be paid.
(*In re City of Buffalo*, 68 N. Y. 167.)

In concluding this opinion the court expresses its acknowl-
edgment for the argument and research of counsel on either
side.   By their aid we have been greatly assisted to determine
between the parties whether plaintiff could invoke the law of
eminent domain in this case,—that power in the exercise of

which, a modern writer (Randolph) says, is invariably provoked a direct issue between man and the state.

### SPURS AND CROSSINGS.

Gagnon Spur Crossing.    The order of the district court in relation to the Gagnon spur is more fully set forth in the statement of facts appended to this opinion.    Its use to the defendants was for the delivery of supplies and fuel to the Gagnon mine.    It was on the north side of the Montana Union track, while the mine is on the south side of the track and at such a distance from the railroad that supplies are hauled by wagon from the spur to the mine.    Where the plaintiff's track crosses the Gagnon spur it is at the same level as the defendants' track, but the spur descends from the time it leaves the Butte, Anaconda & Pacific track and the grade of the plaintiff's track at the point of crossing is considerably above the spur grade.    In view of the fact that it would be plainly for the greater convenience of the appellant company to have the spur on the south side of their main track, the order of the district court in relation to this spur is modified, and unless plaintiff and defendants otherwise agree, the order of the district court will be that the Butte, Anaconda & Pacific Railway Company, at its expense, construct a spur, or rebuild the one already constructed upon the south side of the Montana Union main track; and, further, that the said Butte, Anaconda & Pacific company at its own expense construct and provide suitable and convenient approaches to said spur for teams and wagons, having due regard to the nature and facilities of transportation between the Gagnon mine and the Montana Union Company.

Buffalo Spur Crossing.    There is a slight difference of elevation of grades of the two roads at the Buffalo spur.    The only practicable way of crossing at the point marked F on the map was to raise the grade of the track of the respondent from the switch of the main track as far as the crossing by the Butte, Anaconda & Pacific.    No change was to be made on the main line, and the grade of the spur is to be the same as formerly

from the crossing to the end of the spur.   We think that the respondent should construct this crossing in the manner proposed, and at their expense entirely, unless it is agreed otherwise between the parties themselves.

Haggin Spur Crossing.   The civil engineers take very different views of the feasibility of this crossing.   A short distance from the crossing the Butte, Anaconda & Pacific Company found it necessary to construct a reverse grade leading to the Montana Union track.   This made a ''hump,'' as railroad men call it,—that is, an uphill and a downhill grade,—on the Butte, Anaconda & Pacific road a very short distance from the crossing.   This, of course, was necessary to enable the Butte, Anaconda & Pacific to cross without disturbing the grade of the Montana Union track.   The principal objection to it by the Montana Union witnesses was that it was impracticable and unsafe because of passing over the hump, and, considering the general grade of the railroad, the Butte, Anaconda & Pacific trains would break in two, and thus, by wreckage and other mishaps, the Montana Union tracks would be obstructed and their traffic materially interfered with.   It is difficult for us to say, in the radical disagreements of skilled engineers, what the probable effect of this hump may be, but it occurs to us that, as its dangerous tendencies are all primarily towards accident to the Butte, Anaconda & Pacific, and only indirectly to the Montana Union, the risk, if any, and the scientific error, if any, will fall much more heavily upon the respondent than upon the appellants, and that therefore it is proper for us to affirm the order of the district court.

We see no error in referring the question of damages for crossings to the commissioners, as was done by the order of the court.   The statute covers the matter.   (Comp. St. 1887, p. 218, § 607.)

The last objection of the appellants is to the order of the court giving the power and authority to the Butte, Anaconda & Pacific Company alone to employ and discharge watchmen at the crossings, for whose wages the plaintiff and defendants are jointly responsible.   In view of the fact that the respond-

ent company invokes the right to make these several cross-
ings, it would seem quite just that the expenses of a watchman
to guard the Haggin Spur crossing and others, if any, where
the district court ordered watchmen, should be borne by the
respondent alone. We see no objection to permitting the
watchmen to be chosen by the Butte, Anaconda & Pacific Com-
pany, and it will be directed by this court that the order of
the district court shall be modified so as to impose the expenses
of watchmen entirely upon the respondent corporation.

Let the judgment and order of the district court be re-
manded for modification in conformity with the views ex-
pressed in this opinion, and when so modified it will stand as
affirmed.

*Modified and Affirmed.*

PEMBERTON, C. J., and DE WITT, J., concur.

[Submitted June 19, 1895. Decided July 29, 1895.]