FRUGÉ, Judge ad hoc.
This is an expropriation suit. Plaintiff-appellant herein is a Public Service Corporation organized for the purpose of developing and transmitting electricity for power, lighting, heating and other uses, and petitioner is, under its charter, conducting its business and operations in the State of Louisiana, including the Parish of Vermilion.
Appellant herein, Gulf States Utilities Company, is presently engaged in the construction of a power line for the purpose of transmitting electricity for power lighting, heating and other uses, from and to the following points:
(a) From its Abbeville Sub-station, East of Abbeville, to the .Town of Erath and the Texas Pipe Line Company pumping station near the Town of Erath.
(b) From the above point to the City of New Iberia, Louisiana.
This line is presently under construction.
Defendant, Benjamin Callahan, owns a 29.75 arpent tract of land, which is located in Vermilion Parish, Louisiana, and which tract lies directly in the path of the line under construction.
Servitudes have been acquired by plaintiff-appellant on both sides of appellee’s tract of' land. Tender was made and refused by appellee prior to the filing of the suit.
There are no improvements on appellee’s tract except fences and'one hand-pumped water well.
The Trial Court denied plaintiff’s right to obtain the servitude herein requested and held that the court was not convinced that necessity exists for the expropriation of defendant’s property.
Plaintiff has appealed to this court from this Judgment.
From the testimony in the record of the witness, Rex Lee, graduate engineer and plaintiff’s distribution engineer, the court believes that plaintiff, Gulf States Utilities Company, is a public service corporation, charged with the duty of furnishing electric power to all persons within its reach. The public is made up of individual persons, and, whether they are operating individually, or as firms or corporations, they are entitled to demand, and require service from plaintiff.
This line is being constructed, and was originally planned because of the demands and requirements existing both on the part of the Texas Pipe Line Company and of the general public residing, and doing business, in the area between Abbeville and New Iberia. These cities are some twenty miles apart.
It is important to note that the first and immediate object of the line is the furnishing of power to the Texas Pipe Line Company, but, such power will be immediately available to the general public in the area. The line is planned to continue from the first point to New Iberia, and electric service is to become available to all who desire it.
The pertinent testimony of Mr. Lee under direct examination is as follows:
“Q. Would you state your name, and occupation ? A. My name is Rex Lee. I’m electrical engineer for Gulf States Utilities Company in Beaumont, and, of course, their territory covers portions of Louisiana and Texas.
*610 “Q. Would you give the Court, Mr. Lee, your professional qualifications and background? A. I’m an electrical engineering graduate from the University of Florida in 1928, worked for G. E. Company a couple of years and then I came to Gulf States and worked for Gulf States in various engineering capacities and I’m now transmission distribution engineer and in the assistant engineering department. I have a professional engineer’s license in the State of Texas and also in the State of Louisiana.
“Q. Mr. Lee, did you, in your capacity as engineer for Plaintiff, work on the laying out of the line which is at issue in this case, and if so, would you give a description of that line and tell the Court what is required in connection with that type of line? A. The selection of the route for this line came under my department. I had three men that were actively engaged in the field who selected the exact route of the line. However, in selection of this route, they were in consultation with me, all the time, and also with the other officials of the company. It might be well to say something about how we select a route for a line. We try to select the route that will interfere with improvements on land as little as possible. We also try to select a route that we think would interfere as little as possible with anybody’s land, for instance, we generally try to stay away from state highways and not try to go just directly on the state highway. Now, this particular line is going to serve the Erath Pumping Station of the Texas Pipeline Company. This pumping station is going to have an ultimate capacity of about something over five-thousand horsepower and in order to serve a load of this magnitude, and the distance involved, which will require a sixty-nine thousand volt line—
“Q. Excuse me, did you say sixty-nine thousand? .A. That’s right Now, also in connection with the serving of this load, we have plans for a future inter-connection between our five points sub-station at Abbeville and their New Iberia sub-station, and so we planned the two together. Let’s see, which will, I believe, you asked about the—
“Q. That requirement that we cross Mr. Callahan’s tract. A. We selected our route and we have already acquired all of the right of way except this one tract, and one other. Now, if we don’t go across Mr. Callahan’s tract, we would have to reroute the line which would require getting additional easements from other people and maybe several additional easements might require throwing several additional angles in the line, and every time you throw an angle in the line, why you increase the expense tremendously because an angle structure costs anywhere from two to three times as much as what we call a tangent structure, which is a structure that has no angle on it so you can see if we don’t cross Mr. Callahan’s land it’s going to cause us to have to go to lots of other people and also to lots of additional expense.
“Q. To sum up your testimony, did you say that to depart from a straight line is both expensive as far as the company is concerned, and creates additional servitude to other people’s land, is that right? A. That’s correct.
“Q. What are some of the additional disadvantages of having angle structures in your line? A. One of the biggest disadvantages, of course, is the cost because they are considerably more expensive and another is that every time you put an angle, you have a possible weakness in the line in that there is a potential place for guy-wire to give way, or something else to happen, so, it is best engineering to run the line as straight as practicable.
“Q. Well, you testify therefore that the crossing of this land is unavoidable, is that right? A. It is un *611 avoidable if you — well, we’ll say it’s unavoidable. You probably don’t mean' that it’s impossible.
“Q. That’s right. A. Because you could go around as I stated before by taking easements on lots of other people’s property and also putting in lots of additional angles.”
The above testimony was not refuted by defendant. There is no evidence in the record by the defendant regarding the question of necessity.
Plaintiff-appellant is a corporation created for the purpose of developing and transmitting electricity for power, lighting, heating or other uses. It therefore qualified under LSA-R.S. 19, Section 2, as being a corporation authorized to expropriate private property for the purposes for which it exists. This question is not at issue here.
Under the Constitution and the statutory laws of Louisiana there are two essential requirements for the exercise of the power of-expropriation, viz:
(1) The taking must be for public purpose and utility; and
(2) Compensation must be paid.
Let us first consider the first point. ' Our Supreme Court in the case of River & Rail Terminals v. Louisiana Railway and Navigation Company, 1930, 171 La. 223, 130 So. 337, 338, held that, “the question as to what constitutes public utility and public purpose (in matters of expropriation) is for judicial determination”.
Let us consider the immediate necessity and purpose for the line which is sought here to be constructed across defendant-appellee’s property. Appellant has clearly shown that the immediate necessity for the construction of the line is to serve the Erath pumping station, owned and operated by The Texas Pipe Line Company. The pumping station is going to have a capacity of more than 5,000 horsepower. It is shown then, by the testimony of the plaintiff’s engineer, that the power which is to be delivered to the location of the pipe line station, is to be available at once to the whole area surrounding the station, as well .as the area covered by the line between Abbeville and the City of New Iberia.-
This identical question was considered by the Supreme Court of Louisiana in the case of Kansas City S. & G. Railway Company v. Louisiana Western Railroad Company, 116 La. 178, 40 So. 627, 5 L.R.A., N.S., 512. In that case the plaintiff sought to expropriate several crossings over the tracks of the defendant company. The allegation that these crossings were necessary to enable plaintiff Company to properly conduct its business as a common carrier were made. Defendant contested plaintiff’s right to expropriate the crossings on the ground that the purpose was to secure a right of way for the construction and operation of spur tracks to reach private industries. The Supreme Court of Louisiana held that inasmuch as the proposed spur track would reach, not only the industries already in existence, but would be open for the public use, the question of necessity was satisfied. The Court cited the case of Butte, A. & P. Ry. Co. v. Montana Union Ry. Co., 16 Mont. 504, 41 P. 232, 238, 31 L.R.A. 298, 50 Am.St.Rep. 508. In the cited case, the plaintiff sought to expropriate, for a branch railway, a portion of the right of way of defendant company. The object of the line was to reach certain mines, mills and other industries. To the objection that the purpose was private and not public, the Supreme Court of Montana said:
“The character of a way, whether it is public or private, is determined by the extent of the right to use it, and not by the extent to which that right is exercised. If all the people have the right to use it, is a public way, although the number who have occasioned to exercise the right is very small. * * * All termini of tracks and switches are more or less beneficial to private parties, that the public character of the use of the tracks is never affected by this.”
The Supreme Court of Louisiana in the same case cited Chicago & Northwestern Railroad Co. v. Morehouse, 112 Wis. 1, 87 N.W. 849, 852, 56 L.R.A. 240, 244, 88 Am.St.Rep. 918, in which the Supreme Court of Wisconsin said:
“A brief reference to some of fhe leading 'authorities will amply show *612 that the fact that a spur track may run to a single industry does not militate against the devotion of the property thereto being a public use thereof, so long as the purpose of maintaining the track is to serve all persons who may desire it, and all can demand, as a right, to be served, without discrimination.”
It appears to us that public necessity is certainly more clearly shown in the present case than in Kansas City S. & G. Railroad Company v. Louisiana Western Railroad Company, supra. In the present case, plaintiff-appellant has shown not only that the line was immediately necessary for the use of the Texas Pipe Line Company, but it has shown that the area lying beyond the Texas Pipe Line Company plant and on beyond to the City of New Iberia would be served. This case, therefore, not only involves the necessity for the immediate serving of the Texas Pipe Line Company and the surrounding area, but involves the necessity for the serving of an area some twenty miles in length. This area is one of the most densely populated areas of the State of Louisiana.
We are, therefore, of the opinion that the Trial Court erred in holding that the proposed line was not necessary.
We now consider the value of the property sought to be expropriated.
Defendant’s land consists of a tract of 24.30 acres, and the line is to be located along the northerly 100 feet of defendant’s tract. This is across one of the narrow sides of defendant’s land. The servitude area will consist of 4% acres.
The land is not presently under cultivation.
There are no improvements located on this tract of land except the land is fenced, and there is located thereon a hand-pump water well 58 feet deep. There is also a small barn, which is not located in the servitude area. The tract of land is located south of and adjoining the right of way of the Texas & Pacific Railroad branch line which runs from Erath to Abbeville. North of the railroad is located the Erath-Abbe-ville Highway. Between the railroad right-of-way and the tract of land is located a large ditch, and a ditch is also located between the railroad and the highway. To get to defendant’s line one must cross two bridges over deep ditches and a railroad grade crossing. It was shown by plaintiff’s testimony, which is uncontradicted, that plaintiff acquired several servitudes of like nature across adjoining lands and lands in the very near area at the rate of $1 per rod, plus $100 for each two-pole structure. This is the amount tendered by plaintiff to defendant in the present case. Plaintiff introduced several deeds showing that adj oin-ing land owners, and land owners in the area, had granted to plaintiff, servitudes of similar nature for a price based on the same formula. It was stipulated herein that plaintiff would agree to dig a similar well on defendant’s land at any other place designated by him and without cost to defendant. All damages occasioned by the construction or maintenance of the line must be paid by plaintiff.
Plaintiff introduced real estate experts to show the value of the defendant’s land. Sidney P. Landry, one of the experts, tes-' tilled that the value of the land was $125 per acre and that the construction of this electric line would depreciate the servitude area by 10% and that the remainder of the land would not be depreciated to any measure. The other expert witness, Mr. J. Howard Stansbury, placed the value of the land at $150 per acre, otherwise his testimony corroborates the other witness. The defendant stated that his land was worth $5000 per acre. The expert witness of the defendant, Mr. Robert J. Boudreaux, placed a value of about $500 per acre for minerals and placed a value of $250 to $300 per acre for cultivation purposes.
Mr. Callahan, the defendant, evidently placed the high value of his land because of an offer the witness, Mr. Boudreaux, had made him of $10,000 for the entire tract. A careful review of the testimony by this court discloses the fact that Mr. Boudreaux made this offer because of the mineral value.
It is well to note at this time that inasmuch as plaintiff is seeking a mere servitude the defendant retains his lands in fee and consequently, all minerals. Mr. Boudreaux *613 testified that a well could be drilled on the Callahan property notwithstanding the existence of the 100 foot servitude sought herein.
The most recent jurisprudence that we have been able to find, or pointed out to us, relating to the present problem is, we believe, the case of the American Telephone & Telegraph Co. of La. v. McGuire, 219 La. 740, 54 So.2d 4, decided by our Supreme Court in 1951. In that case the defendant owned a tract of farm land, the same as in the case at bar. The tract contained 60 acres, whereas in the case at bar it contains 24 or 29 acres. The right-of-way traversed this land for some 1100 feet. Defendant claimed $5923.50 for his damages claiming that the line cut his land in half. The line was a telephone cable which was placed underground. The contention of the defendant was that the bisecting of this tract of land by the line would render some forty acres south of- the right-of-way valueless because it would not front on the public road, and consequently claimed diminution in value from $250 per acre down to $150 per acre. The Court found that the land in question was primarily agricultural in nature and the amount fixed by the Trial Court of $100 compensatory damages was upheld by the Supreme Court despite strenuous demands by the defendant to the contrary. The court, in effect, held that the granting of this right-of-way did not materially diminish the value of the property for the purpose for which it was being used. This is exactly the situation in this case. With the exception of 5 poles there are absolutely no obstructions to the defendant’s use of this property for the purpose for which it is best suited, and that is farming.
The Supreme Court, in the American Telephone & Telegraph Co. v. Maguire, case, supra, saw fit to cite Harrison v. Louisiana Highway Commission, 191 La. 839, 186 So. 354. The Harrison case involved a servitude for highway purposes.
It is to be observed that the court approvingly cited the early case of McMahon v. St. Louis-Arkansas & Texas R. R. Co., 41 La.Ann. 827, 6 So. 640, wherein it was held that the court would not warrant the extending of liability beyond actual damages. The court held that mere consequential injuries to the owners arising from discomfort, disturbance, injury to business, and the like, remain as they were before, particular sacrifice to which society has a right to inflict for the public good. Ini the case of Helmer v. Colorado Southern No. O. Pacific R. R. Company, 122 La. 141, 41 So. 443, the Supreme Court held that the amount of damages to be determined was a difference between the market value before the road was built and the market value after. In the case of Louisiana Highway Commission v. Israel, 205 La. 669, 17 So.2d 914, the court recognized the rule that market value of property is its fair value between one who wants to purchase and one who wants to sell under ordinary and usual circumstances. .
There is no evidence in this - record regarding an offer to purchase the property of Benjamin Callahan except by one Robert Boudreaux, who testified that he had offered Mr. Callahan $10,000 for this land including the mineral rights. As observed elsewhere in this opinion Mr. Boudreaux clearly indicates the high value of his offer with reference, to the mineral value of the land and not to its agricultural value as he places the value of the land for agricultural purposes at between $250 and $300 per acre.
The evidence in this, case establishes the fact that the servitude would diminish the value of the area affected by said servitude by some 10 to 15 per cent, which is far below the amount tendered in this case. It also' establishes the fact that the remainder of the tract of land would not be depreciated to any measure. The evidence further establishes the fact that the plaintiff in this casé has been obtaining a like servitude in the neighborhood at the rate of $1 per rod, plus $100 for each two pole structure and upon the same basis as the amount tendered in the case at bar. The court believes, after a careful study of this testimony, that the sum of $426 which was deposited in the Registry of the Court in this suit is fair and ample payment for the 4% acres taken by the servitude.
*614 The record clearly bears out the fact that insofar as the actual servitude area is concerned, defendant’s use thereof, for farming purposes, will not be greatly affected.
The Judgment of the District Court is therefore reversed and accordingly the following decree is handed down:
It is therefore ordered, adjudged and decreed that there be judgment herein in favor of plaintiff, Gulf States Utilities Company, and against defendant, Benjamin Callahan, decreeing that the servitudes and rights, as follows, be expropriated and adjudged to plaintiff Utility Company:
That a perpetual servitude be granted unto plaintiff, Gulf States Utilities Company, a corporation organized under the laws of the State of Texas, domiciled in the City of Beaumont, State of Texas, to enter upon the tract of land described as follows:
A certain 29.75 arpent tract of land situated in Section 47, T12S, R4E bounded now or formerly as follows: North by right-of-way of Iberia and Vermilion Railroad and'Perfey Broussard; East by Per-fey Broussard; South by Antoine Sanchez Estate; and West by Felician Robicheaux; and being' situated in the Parish of Vermilion, Louisiana;
and thereon to erect, construct, extend, maintain, inspect, operate, replace, remove, repair and patrol one line of poles, frames or towers, which may be erected simultaneously or at some future time, with lines of wires, cros.s-arms, guy wires, conduits, stubs, and other usual fixtures, appliances and appurtenances used or adapted for the transmission of electricity, electric energy and power for any and all purposes for which electricity, electric energy and power is now or may hereafter be used, and for telephone and telegraph use, together with all necessary foundations, anchors and braces properly to support the same upon, over and across a strip of land out of the above described tract of land, which strip of land is described as follows, to-wit:
Fifty (50) feet on each side of a center line particularly described as follows:
Entering on the West line of this tract of land at a point 50' feet, more or less, southerly from the northwest corner of same; Thence S 80° 59' E 2076 feet crossing the northerly line of this tract of land, same being also the southerly line of a tract of land owned by Edier Broussard, at a point S 71° 30' W 150 feet, more or less, from the intersection of said northerly line extended with the southerly line of the Iberia and Vermilion Railroad right-of-way.
Further, that said perpetual servitude shall include, the right to cut, trim, or remove, at all times, without further payment therefor, all trees and underbrush that may be upon the land covered by the above described servitude.
That in order to make said perpetual servitude effective it is necessary that neither the defendant, Benjamin Callahan, nor his heirs or assigns shall erect or permit the erection of any structure of any type whatever, on the above described servitude, but they may fence any and all of the said property, in which event the Plaintiff, Utility, herein, its contractors, successors and assigns, shall have ingress and egress at any and all times to and from the said lands covered by the said servitude, and that further, the defendant, Benjamin Callahan, his heirs or assigns are to retain the right to use for his own purposes, the land covered by the said servitude so long as such use does not interfere with the servitude and rights herein sought.
And, that the payment for such, the sum of Four Hundred Twenty Six and No/100 ($426.00) Dollars, the amount deposited in the Registry of the Court, and the Clerk of Court, in and for the Parish of Vermilion be and he is hereby directed to pay said sum unto Benjamin Callahan; and
. That all costs of this suit in the District Court and in this Court be paid by defendant.